## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LEE ROY STALLMAN,

     Plaintiff,               Case No. 22-12635
                                Hon. Jonathan J.C. Grey

v.

DARIUS ZAJAC et al.,

     Defendants.

_____/

## <u>OPINION AND ORDER GRANTING DEFENDANT'S MOTION<br>FOR SUMMARY JUDGMENT (ECF No. 48)</u>

On November 2, 2022, Plaintiff Lee Roy Stallman filed this complaint against Defendants Oakland County and Darius Zajac alleging First, Fourth, and Fourteenth Amendment violations, intentional infliction of emotional distress, false arrest, malicious prosecution, and municipal liability under 42 U.S.C. § 1983. (ECF Nos. 1, 7.) On March 21, 2023, Stallman amended his complaint to remove his Fourteenth Amendment, intentional infliction of emotional distress, false arrest and malicious prosecution claims. (ECF No. 22.) On June 26, 2023, this case was reassigned from United States District Judge Sean Cox to this Court. On March 19, 2024, this Court granted Oakland County's motion to

dismiss, and Oakland County was terminated from this case. (ECF No. 32.) On August 28, 2024, this Court granted in part Stallman's motion to file a second amended complaint. (ECF No. 42.) On September 24, 2024, Stallman filed his second amended complaint against Zajac alleging unlawful arrest and malicious prosecution. (ECF No. 44.)

On September 30, 2024, Zajac filed a motion for summary judgment. (ECF No. 48.) The motion is fully briefed. (ECF Nos. 56, 57, 58.) Applying E.D. Mich. LR 7.1(f)(2), the Court rules on this motion without a hearing as oral argument will not aid the Court in its decision. For the reasons stated below, Zajac's motion for summary judgment (ECF No. 48) is **GRANTED**.

## I.   BACKGROUND

On October 18, 2019, Stallman quit his employment as a truck driver with Sweetland Transportation ("Sweetland"). (ECF No. 48, PageID.719–720.) Stallman alleges that after he quit, Sweetland still owed him a final paycheck. (*Id.* at PageID.721.) On October 25, 2019, Stallman claims he called Sweetland about this final check and spoke with Stefania Ristoski. (*Id.* at PageID.722–723.) Ristoski allegedly told

Stallman his final check would be mailed, and he would be provided with a certified tracking number. (*Id.* at PageID.723.)

On October 31, 2019, Stallman alleges he had still not received his final check. (*Id.*) That same day, Stallman called Oakland County Sheriff's Department ("OSCD") to request that an officer accompany him to Sweetland and facilitate Stallman obtaining his final check. (*Id.* at PageID.736.) Stallman then went to Sweetland and met OCSD Deputy Zajac there. (*Id.*) Stallman and Zajac had not met prior to this interaction. (*Id.*) Zajac alleges that during their initial conversation, Stallman mentioned a shooting that had occurred between coworkers over an employment dispute. (*Id.* at PageID.918–919, 1017.) Initially, Zajac did not find the reference concerning. (*Id.* at PageID.918–919.) Stallman also allegedly generally mentioned a gun during this conversation. (*Id.* at PageID.920.)

While Stallman remained in the parking lot, Zajac entered Sweetland's office and discussed Stallman's final check with Sweetland employees Sonja[1], Ristoski, and Nicole Meier. (*Id.* at PageID.916.) Zajac

---

[1] No last name is given for Sonja. Therefore, the Court will refer to her by her first name only.

alleges the women informed him that they were "fearful" of Stallman, due to the "constant contacts and phone calls to the office demanding his last paycheck." (*Id.* at PageID.917.) Zajac claims that after he left Sweetland's office, he advised Stallman to come back at a later date when Sweetland's owner was available. (*Id.* at PageID.919.) It is unclear whether Zajac relayed to Stallman that the women were afraid of him. Stallman claims that after Zajac exited Sweetland's office, Zajac communicated that Sweetland had sent the final check's tracking number to "the dispatch office." (*Id.* at PageID.729, 737.) Subsequently, both Zajac and Stallman left Sweetland. (*Id.* at PageID.738, 920–921.)

Presumably at some point that same day, Stallman allegedly called the dispatch office to confirm receipt of the tracking number, but he was told they never received it. (*Id.* at PageID.729.) That same day, after he and Zajac left Sweetland, Stallman repeatedly called Sweetland's office. It is unclear how many times he called, but the record includes three separate instances in which Stallman initiated calls to Sweetland. In

total, Stallman left two voicemails and spoke to Meier over the phone

once.[2] In the first voicemail, Stallman stated the following:

> I want my check, you want me to stop calling. . . . I don't want
> to continue calling, but I'm going to until you give me my
> check or you give me the tracking number that proves you
> actually sent it out. You owe me for the wages that I earned
> and you will pay me whether you like it or not. You want to
> play your games, that's on you. But I'll tell you what, play
> stupid games, win stupid prizes. I'm going to take you to court
> and I'm going to sue you. . . . You guys are a sad excuse for a
> professional company. You want me to leave you alone, give
> me my stuff. . . . If you don't have [the money or tracking
> number] by the end of your business day whenever you guys
> stroll out of there, I'm going to come and knock on your doors
> at home. You think I'm joking, I'm going to knock on your
> doors. . . . And then when you trespass me from your property,
> I'm gonna go to the gyms, the [], the restaurants, the schools,
> I will go wherever you go and I will ask you, "Where's my
> money?" Do you want that or do you just want to give me my
> money? I don't want to have to pester you, continue to ask for
> my money, but I will. I'm going to show you that you cannot
> play games with somebody and their money. You got the
> wrong one. You got the wrong one. I want my money. I want
> my property. I'll get my property at another time.

(*Id.* at PageID.1023–1024.) Stallman's second voicemail consisted

of the following:

---

[2] Meier claims she spoke to Stallman over the phone "at least twice", but the record
only reflects a single instance in which they spoke. (ECF No. 48, PageID.1037, 1050.)
The first call is reflected in the transcript provided in the record. (*Id.* at PageID.1029–
1030.) The second call allegedly involved Zajac, but the transcript that reflects the
only phone call between Zajac and Stallman does not include any reference to or
dialogue from Meier. (*Id.* at PageID.1085–1096.)

This message is for Nicole. This is Lee, truck 1036. I want to
know if you're going to provide me with the tracking number
for the check that you claim you mailed out. This is getting
very old. You guys are not very professional, whatsoever.
You're actually quite childish, and if I don't hear from you by
the end of today, or if the check is not in my post office box
today I'm going to take legal matters against you, and you can
sit on that check because you're going to need the interest to
pay me when I get done. This is completely and utterly
ridiculous, and I don't believe that any judge is going to side
with somebody who treats their employees, ex-employees, in
this manner, especially in Oakland County after there was a
murder in Waterford from somebody not paying a driver,
which was a friend of mine in Taylor. I discussed that with
you guys when you hired me, but then you want to play games
with my check. I want my check so I can leave town to go and
start a job in another state. The longer you prevent me from
leaving town with your nonsensical games is not going to look
good when I take you to court. Give me my check or the
tracking number. And I'm obviously not going to get my
property, and I'll take you to court over that. You guys should
be ashamed of yourselves.

(*Id.* at PageID.1026–1027.) At some point, on this same day, Stallman

had a brief phone conversation with Meier that proceeded as follows:

MEIER: Good afternoon, saline April [sic].
STALLMAN: Could I get the tracking number to the check
that you sent out please?
MEIER: I told you I told the police officer that was here that
was going to send it as soon as [Nichole Gavriloski][3] sent it to
me and she was done driving.
STALLMAN: How long is she going to be driving for?

[3] In her deposition, Meier claims the daughter in law of Sweetland's owner, Nichole
Gavriloski, would sometimes write checks for truck drivers and was the person who
mailed out last checks with tracking numbers. (ECF No. 48, PageID.1034–1035,
1049.)

MEIER: (Unintelligible).
STALLMAN: Listen, let me explain something to you.
MEIER: Listen.
STALLMAN: I'm about to go out of town here and the longer you guys play, the more I'm going to sue you for. Just give me my check so I can go on about my life. And I'll—
MEIER: (Unintelligible).
STALLMAN: I'll deal with my property later.
MEIER: (Unintelligible).
STALLMAN: I'm not—
MEIER: (Unintelligible).
STALLMAN: I'm not going to argue with you. You guys are – you're not very professional whatsoever.
MEIER: Can you please stop calling because (unintelligible).
STALLMAN: No, I'm not gonna stop calling till you give me my money.
MEIER: (Unintelligible).
STALLMAN: Call the cops on me.

(*Id.* at PageID.1029–1030.)

At some point after this call, either Sonja, Ristoski, or Meier called the OCSD to report Stallman's behavior and Zajac was subsequently dispatched to Sweetland again. (*Id.* at PageID.921, 1037.) Zajac claims he returned to Sweetland and spoke with Sonja, Ristoski and Meier about what occurred. (*Id.* at PageID.1013.) Ristoski allegedly played Zajac a voicemail message in which Stallman was "rambling how [Sweetland employees] were all liars and that he would never recommend the business to anyone." (*Id.*) Presumably, both voicemail messages provided in the record were ultimately played for Zajac. (*Id.* at PageID.922–923.)

7

Meier also told Zajac she had spoken to Stallman on the phone and he sounded "extremely manic and threatening" and was "yell[ing] and scream[ing] over the phone." (*Id.* at PageID.1013.) Zajac proceeded to call Stallman[4] and below are excerpts from their conversation:

> STALLMAN: Yes.
> ZAJAC: Hey, Lee, it's Deputy Zajac from the sheriff's office, how are you?
> STALLMAN: I'm good, Bud, how are you?
> ZAJAC: Ahh, I'm okay. Hey, I'm over here back at –
> STALLMAN: Uh, yeah.
> - ZAJAC: (unintelligible) work, okay? I thought we had an understanding that Monday you would come here, okay? It doesn't help that you're calling Stephanie and Nicole and other people here.
> STALLMAN: Oh, so now I'm the problem?
> ZAJAC: Well, I'm just telling you you can't be doing that.
> STALLMAN: Yeah?
> ZAJAC: (Unintelligible).
> STALLMAN: I want my money. I want my – I want my check. Alls [sic] they have to do is give me my check or give me the tracking number.
> ZAJAC: (Unintelligible).
> STALLMAN: Were you the officer that I came – that came to the scene?
> ZAJAC: Absolutely.

---

[4] It is unclear from the record whether this call is the same as the call in which Meier claims she spoke with Stallman a second time and, ultimately, passed the phone to Zajac. (ECF No. 48, PageID.1040.) ("[Meier] had [the call] on speaker phone if [she] remember[s] correctly and [she] was trying to talk to [Stallman] and just tell him, can you just listen for a minute? Can you please just listen and [Stallman] just kept going, "No, you listen. I need my check," and Deputy Zajac took over the phone call.") It should be noted that the transcript for this call does not reflect Meier being a part of the conversation. (*See* ECF No. 48, PageID.1085–1096.)

STALLMAN: Do you – ask them how many times – how many times do they have to tell me that they're gonna text me the tracking number after [Nichole] stops driving? I've been hearing this since Friday.

ZAJAC: Lee, okay? I can't help that they – that the person that handled your last check is not in the office. You know –

. . .

ZAJAC: Calling here relentlessly, okay? Is – you know, harass–

STALLMAN: Charge me. Charge me.

ZAJAC: Okay? Just – just stop.

STALLMAN: Charge me

ZAJAC: Lee, you're not understanding, okay? I'm telling you what's going on and I'm also going to tell you that the management here no longer wants you on the (unintelligible).

STALLMAN: I don't care what they want. I want my check. I want my check.

. . .

ZAJAC: Okay. You – well, I'm telling you you come back here. I'm gonna arrest ya. That's (unintelligible).

STALLMAN: Oh, oh, okay.

. . .

STALLMAN: Have I committed a crime?

ZAJAC: You will if you come here.

STALLMAN: I don't plan on going [there].

ZAJAC: (unintelligible). Okay. Then don't.

STALLMAN: Have I committed a crime?

ZAJAC: (unintelligible).

STALLMAN: Have I committed a crime?

ZAJAC: Not yet.

STALLMAN: Oh, so why don't you wait until I do before you call me and threaten me.

ZAJAC: I'm not threatening you.

STALLMAN: Yes, you are.

(*Id.* at PageID.1085–1092.)

9

There are no further alleged communications between Meier and Stallman on October 31, 2019. On November 1, 2019, Stallman claims that while he was driving to complete a personal errand, he saw Zajac in a police car driving down the road in the direction of Sweetland. (*Id.* at PageID.743.) Zajac claims he drove to Sweetland because he passed a red truck that looked similar to Stallman's and he wanted to check on the women in Sweetland's office. (PageID.1013.) Stallman claims he started to follow Zajac to confront him after Zajac gave him a "dirty look" as their cars passed each other. (*Id.* at PageID.745.) Stallman parked his car on the public roadway as he allegedly waited for Zajac to return. (*Id.* at PageID.748.) Zajac entered Sweetland, checked on the women, and then parked in the Sweetland parking lot as he completed a report for a different matter. (*Id.* at PageID.1013.)

Meier claims she, Sonja and Ristoski saw Stallman's truck outside through the window. (*Id.* at PageID.1041–1042.) She also claims Stallman was yelling at passing cars and making unspecified hand gestures. (*Id.* at PageID.1042.) Meier then says she exited the business to alert Zajac, who was still parked behind Sweetland's office, that Stallman was outside. (*Id.*) While waiting, Stallman claims he saw Meier

and Ristoski walking in the parking lot and waved to them. (*Id.* at PageID.749.) He claims they looked shocked to see him and hurried back into the building. (*Id.* at PageID.750–751.) While Ristoski claims this occurred as well, Meier does not recall going outside and seeing Stallman wave at her. (*Id.* at PageID.1055.) Meier only recalls going outside with Ristoski to tell Zajac that Stallman was yelling at passing drivers and making unspecified hand gestures. (*Id.* at PageID.1056.) Zajac claims he saw Ristoski and Meier "running from the building waiving their hands in an attempt to get [Zajac's] attention." (*Id.* at PageID.1013.) Zajac also claims that the women claimed Stallman saw them through the front business windows and began "yelling and making some sort of gestures at them." (*Id.*) Soon after, Zajac drove to where Stallman was parked and arrested Stallman for disorderly person. (*Id.* at PageID.1099.)

Subsequently, Stallman was charged with one count of resisting and obstructing a police officer. (*Id.* at PageID.1116.) During a preliminary examination held on November 21, 2019, Oakland County Court Judge Lisa L. Asadoorian found that there was probable cause to charge Stallman with one count of resisting and obstructing a police officer. (*Id.* at PageID.1178.) During an evidentiary hearing in Stallman's

11

subsequent criminal case, Oakland County Circuit Judge Shalina Kumar dismissed the charges against Stallman. (*Id.* at PageID.1219–1222.) Specifically, Judge Kumar found that Zajac did not have probable cause to arrest Stallman for disorderly person. (*Id.* at PageID.1220, 1222.)

## II.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will prevent summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir. 2004).

Although it is the case that the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322–323. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## III. ANALYSIS

Stallman has brought two claims against Zajac—false arrest and malicious prosecution. "To prevail on a false arrest claim under § 1983, a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) (internal quotation marks and citation omitted). To prevail on a malicious prosecution claim, plaintiff must show: (1) that a criminal

13

prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor. *Id.* at 654–655 (citing *Sykes v. Anderson,* 625 F.3d 294, 308–309 (6th Cir. 2010)).

Because both claims depend upon a probable cause finding, the initial issue before the Court is whether or not Zajac had probable cause to arrest Stallman. *Watson v. City of Marysville*, 518 F. App'x. 390, 392 (6th Cir. 2013) (quoting *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985)) ("[T]he existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest . . . or malicious prosecution.").

## A. False Arrest Claim

Zajac argues that because he allegedly had probable cause to arrest Stallman for stalking, Stallman's false arrest claim is unavailing. (ECF No. 48, PageID.687.) Although the Oakland County Circuit Court found that Zajac did not have probable cause to arrest Stallman for disorderly person and resisting arrest, the existence of probable cause for any

14

arrestable offense will defeat a false arrest claim. (*See id.* at PageID.1220, 1222); *Amis v. Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004) ("[An] officer can lawfully arrest [a] plaintiff so long as there is probable cause to arrest her for some crime, even if the crime for which there is probable cause is different from the stated crime of arrest.").

Zajac claims that Stallman clearly committed two or more acts of repeated harassment in violation of § 750.411h. Harassment, under the statute, is defined as "*unconsented* contact," and it is unclear whether Meier did not consent to Stallman's call and his voicemails. *See* Mich. Comp. Laws § 750.411h(1)(d) (emphasis added). Under the statute, "unconsented contact" is defined as "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued." Mich. Comp. Laws § 750.411h(1)(f).

Meier claims that Stallman had called both her and other departments at Sweetland repeatedly on October 31, 2019. (ECF No. 48, PageID.1037.) During the course of these calls, Meier claims that she and Ristoski "asked [Stallman] to stop calling" but he refused to stop. (*Id.*)

However, Meier is unclear on how many times Stallman actually called. (*Id.*) She is only certain that she spoke to Stallman on the phone twice: once when she told him to stop calling and once when "Zajac had told him to stop calling." (*Id.*) Therefore, the record only supports that Stallman initiated contact with Sweetland three times: twice when he left his two voicemail messages and once during his call with Meier.

If the one call with Meier was the first time she told him not to contact her, then the record does not show that Stallman ever contacted her again. In fact, although Meier claims to have spoken to Stallman when Zajac told him to stop calling, the transcript does not reflect this. (*See id.* at PageID.1085–1096.) Instead, the transcript does not include any dialogue from Meier or reference to her being on the call where Zajac told Stallman to stop calling Meier. (*Id.*) Zajac himself does not reference Meier being on the call. (*Id.* at PageID.1122–1123.) Most importantly, this call between Zajac and Stallman was initiated by Zajac, who called Stallman using Meier's work phone. (*Id.* at PageID.1013.) Therefore, viewing the evidence in the light most favorable to the non-moving party, the Court finds that a reasonable jury could conclude that Stallman only spoke to Meier on the phone once.

16

Nevertheless, since a probable cause finding only requires Zajac to have reasonably believed that Stallman was harassing Meier, the Court now looks to facts which have previously supported probable cause findings for harassment under § 750.411h. In *Dixon*, the court found an officer had probable cause to seek a warrant for stalking on the basis of three police reports "which were prepared by three separate Eastpointe police off[ic]ers on distinct dates for distinct (and non-continuous) instances of conduct, two of which characterize the offense as "Intimidation/Stalking" and one which describes the offense as "Assault." *Dixon v. City of Eastpointe*, No. 10-cv-11126, 2012 WL 2525969, at *10 (E.D. Mich. June 29, 2012).

In *Blake*, the Sixth Circuit Court of Appeals affirmed the district court's finding that an officer had probable cause to arrest the plaintiff under § 750.411h. *Blake v. Cty. of Livingston*, 257 F. App'x 848, 852–853 (6th Cir. 2007). Before the arrest, the officer knew that after the victim and plaintiff had a single romantic date, (1) the victim emailed plaintiff asking for no further contact, (2) plaintiff subsequently sent two emails and five voicemails in which he "sounded perturbed" and stated that he was coming to see the victim, (3) the plaintiff sent another message

threatening the victim if she did not meet with him, (4) the officer reviewed the victim's reports to the police that she was afraid and that she had a male friend stay with her for protection, and (5) plaintiff's arrival at the victim's home. *Id.* at 832.

In *Blackwell*, the court did not find there was probable cause to arrest the plaintiff because, for one, his "lawful presence on public property—by itself—[wa]s not conduct 'directed toward' [the defendant] that could qualify as 'harassment' under Michigan law." *Blackwell v. Nocerini*, 123 F.4th 479, 490 (6th Cir. 2024). Additionally, "[the defendant] once spott[ing plaintiff] driving two cars behind her as she went to work" also did not qualify as harassment because it occurred on a main access road. *Id.* at 489–490. There was also a years-long gap between this conduct, which undercut the claim that plaintiff had engaged in a "pattern of conduct" revealing a "continuity of purpose" to harass the defendant. *Id.* at 490; Mich. Comp. Laws § 750.411h(1)(a).

In *Gerics*, a neighbor alleged that he was experiencing "constant threatening behavior" from the plaintiff, which included plaintiff "using a megaphone to call [the neighbor] 'a loathsome HIV positive pedophile' and other names such as 'cocksucker' and 'shithead.'" *Gerics v. Trevino*,

18

No. 15-cv-12922, 2019 WL 2448324, at *6 (E.D. Mich. June 12, 2019). The neighbor repeatedly attempted to file a complaint with the police but was told that they could not intervene because it was a civil matter, not a criminal one. *Id.* at *1. Eventually, the police agreed to send an officer to the neighbor's home. *Id.* During the officer's visit, he observed the plaintiff call his neighbor a "crook" and a "thief," which resulted in the officer arresting plaintiff for breach of the peace.[5] *Id.* at *1, 6. The court found that the officer was not entitled to qualified immunity because "whether [the neighbor's] statements, coupled with [the officer's] personal observations, created enough probable cause to arrest Plaintiff, is a question best left for the trier of fact." *Id.* at *6.[6]

In light of the aforementioned cases, the Court finds that Zajac had probable cause to believe that Stallman was harassing the women who worked at Sweetland as a matter of law. Although the record is unclear

---

[5] The officer argued, in support of his entitlement to qualified immunity, that he had probable cause to arrest plaintiff for both breach of the peace and "criminal stalking" pursuant to § 750.411h(1)(c).

[6] On appeal, the Court of Appeals found that the district court should have resolved the issue of probable cause instead of sending it to the jury. *See Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020) ("Thus, we conclude that the ultimate question of probable cause (separate from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury.").

regarding how many times Stallman called Meier and the other Sweetland employees and there is a question regarding whether Stallman's calls were protected by the First Amendment, Zajac has offered enough facts to establish that, as a matter of law, he had probable cause to arrest Stallman pursuant to § 750.411h.

Specifically, Zajac has shown that he reasonably believed that (1) Stallman repeatedly called Sweetland even after being told to stop; (2) the women who worked at Sweetland were frightened by Stallman's behavior; (3) Stallman had made eerie references to a workplace shooting, threatened to follow the employees around outside of work, and sounded hostile during his calls and in his voicemail messages; (4) Stallman drove and parked within the line of sight of Sweetland's employees the day after Zajac warned him that further contact with Sweetland's employees could lead to his arrest; and (5) Stallman waved to Meier and Ristoski despite seeing how frightened they were of him. *See United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (citation and internal question marks omitted) ("The requirements of probable cause are satisfied where the facts and circumstances within [an officer's] knowledge and of which [the officer] had reasonably trustworthy

20

information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."). Accordingly, Zajac's motion for summary judgment is **GRANTED** as to Stallman's false arrest claim.

## IV.   MALICIOUS PROSECUTION

The parties only contest the probable cause element for Stallman's malicious prosecution claim. (ECF No 48, PageID.682–696; ECF No. 57, PageID.2061.) The crime underlying the malicious prosecution claim is Stallman's charge for resisting arrest under Mich. Comp. Laws § 750.81d(1). Zajac argues that Stallman admits to resisting arrest. However, Stallman counters that § 750.81d(1) does not abrogate the common-law right to resist unlawful conduct by a police officer. *People v. Moreno*, 814 N.W.2d 624, 629 (Mich. 2012). The Court agrees. Therefore, Zajac "must establish that [his] actions were lawful" or the charges are voidable. *Id.* at 631, 634.

Zajac counters that this Court is collaterally estopped from determining whether there was probable cause for Stallman's charge for resisting arrest because the issue was already determined by a state court. Specifically, Judge Asadoorian found that there was probable

21

cause to find that Stallman resisted arrest during a preliminary examination held on November 22, 2019. (ECF No. 48, PageID.1114–1180.)

The Sixth Circuit applies "the state law of collateral estoppel when deciding whether the state court's determination of probable cause at [a] preliminary hearing has preclusive effect[.]" *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *Haring v. Prosise*, 462 U.S. 306, 313 (1983). Under Michigan law, issue preclusion applies when (1) there is identity of parties across the proceedings, (2) there was a valid, final judgment in the first proceeding, (3) the same issue was actually litigated and necessarily determined in the first proceeding, and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Id.* (citation omitted).

Nevertheless, even if the aforementioned factors are present, "a finding of probable cause in a prior criminal proceeding does not bar a plaintiff in a subsequent civil action from maintaining a claim for malicious prosecution under Michigan law where the claim is based on a police officer's supplying false information to establish probable cause."

22

*Hinchman v. Moore*, 312 F.3d 198, 202–203 (6th Cir. 2002); *see also Buttino v. City of Hamtramck*, 87 F. App'x 499, 504 (6th Cir. 2004).

Here, Stallman does not contest any of the factors in favor of finding that collateral estoppel applies due to Judge Asadoorian's finding. Instead, he solely points to Judge Kumar's finding during the September 21, 2021 evidentiary hearing for Stallman's motion to suppress that Zajac did not have probable cause to arrest Stallman for disorderly person. (ECF No. 56, PageID.2008, 2023; *see* ECF No. 48, PageID.1182, 1220, 1222.) However, as Zajac correctly counters, Judge Kumar's finding solely addressed Stallman's disorderly person charge, not his resisting arrest charge. (ECF No. 58, PageID.2335.) To the extent that Judge Kumar's finding resulted in the State of Michigan dropping Stallman's resisting arrest charge, that has no bearing on the preclusive effect of Judge Asadoorian's finding. (*See* ECF No. 48, PageID.1219–1220 (granting Stallman's motion to suppress and the State of Michigan, in response, stating that it was "not able to proceed with th[e] case" because "[t]he law is very clear that a person is able to resist an unlawful arrest . . . [a]nd the Court has ruled that . . . [Stallman's] arrest was unlawful.").) Judge Asadoorian's finding precluded Judge Kumar from making a

finding on probable cause for Stallman's resisting arrest charge, and nothing in the suppression hearing's transcript shows that Judge Kumar was attempting to reject Judge Asadoorian's finding. Therefore, Stallman's argument is unavailing.

If Stallman was arguing that another issue was being contested here, such as the validity of Zajac's testimony at the preliminary hearing, the issue might not have been collaterally estopped. However, since both parties argue that collateral estoppel applies and there is no evidence to contradict their position, the Court is compelled to concur. Therefore, the Court will apply Judge Asadoorian's finding that Stallman resisted arrest. Accordingly, since Stallman's malicious prosecution claim cannot survive if there is a finding of probable cause, Zajac's motion for summary judgment is **GRANTED** as to Stallman's malicious prosecution claim.

## V.   CONCLUSION

For the reasons stated,   **IT IS HEREBY ORDERED** that Zajac's motion for summary judgment (ECF No. 48) is **GRANTED**.

**SO ORDERED.**

<u>**s/Jonathan J.C. Grey**</u>
Jonathan J.C. Grey
United States District Judge

Date:  August 25, 2025

24

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 25, 2025.

<u>s/ **S. Osorio**</u>
Sandra Osorio
Case Manager